IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| ELIZABETH A. DAVIS,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 1:15-cv-01121-JEH |

**Order and Opinion**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 19), the Defendant's Motion for Summary Affirmance (Doc. 24), and the Plaintiff's Reply (Doc. 26). For the reasons stated herein, the Court GRANTS the Plaintiff's Motion for Summary Judgment, DENIES the Defendant's Motion for Summary Affirmance, and REMANDS this matter for proceedings consistent with this opinion.[1]

**I**

On September 30, 2003, Davis was determined disabled as of March 27, 2003. On June 9, 2011, Davis was determined to no longer be disabled as of June 2011. A state agency disability hearing was held and the determination that Davis was no longer disabled as of June 2011 was upheld on reconsideration. On February 1, 2013, Davis filed a request for hearing concerning her application for disability insurance benefits (DIB). A hearing was held before the Honorable John M. Wood (ALJ) on June 6, 2013 during which time Davis appeared without counsel and when informed of her right to counsel, she explained that she would

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 12) on the docket.

like to seek an attorney. The ALJ gave Davis 30 days to look for an attorney rather than proceed with the hearing that day. On December 5, 2013, the ALJ resumed a second hearing and Davis was again unrepresented. Davis did not object to the ALJ proceeding with the hearing at that time. Davis and Vocational Expert James Ragains (VE) testified at that hearing. Following the second hearing, the ALJ determined on January 21, 2014 that Davis's disability ended as of June 1, 2011. Her request for review by the Appeals Council was denied on January 30, 2015, making the ALJ's Decision the final decision of the Commissioner. Davis filed the instant civil action seeking review of the ALJ's Decision on March 26, 2015.

## II

At the time Davis was determined disabled as of March 2003, she had the medically determinable impairments of nephrotic syndrome, diabetes, adrenal insufficiency, and depression. Her nephrotic syndrome was found to medically equal Section 6.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1. She had kidney and pancreas transplants in 2004 and 2005.

When she was determined to no longer be disabled as of June 2011, Davis was 29 years old living in Peoria, Illinois. There was a period of time during which she lived with a boyfriend, but otherwise Davis lived alone. At the December 5, 2013 hearing, Davis testified that she lived with her two cats in a ground floor apartment. She testified that her upstairs neighbor would bring her meals to eat and would go shopping with her to help carry her bags.

Davis testified about a job she had working on her computer at home that lasted for eight work days. She quit during the training phase of the job because she was so far behind, did not understand it, and started to get migraines. She also testified that about two to three years before the hearing, Davis worked as a babysitter. Davis explained that she did not feel she could do any other type of

job because if she stood on her feet for eight hours her feet would swell, if she were around other people in a "big situation" she would experience anxiety, and if she were around other people who were sick she would get sick because of her low immune system.

She stated that she sometimes became dizzy when showering and so would have to go lay down. She spent her days listening to music, painting, playing games on the computer, watching TV, and trying to read. Davis testified that she had a boyfriend with whom she spent most days of the week at each other's homes.

The ALJ then questioned the VE, James Ragains. The ALJ asked whether the qualifications that were set forth in the VE's resume were current and correct, and the VE replied they were. The VE also testified that he did not discuss the merits of the case with Davis or the ALJ prior to the hearing, he was familiar with the jobs that existed in the region (the State of Illinois), and he had reviewed the exhibits in the file pertaining to Davis's past work activity and heard Davis's testimony.

The VE next testified about Davis's prior job which he identified as a telephone solicitor according to the Dictionary of Occupational Titles (DOT) which was a semi-skilled, sedentary job. The ALJ then asked the VE:

> Q. Okay. All right - - all right. Let me then ask you some hypothetical questions. And please disregard any information you may have gathered from reading the file or listening to the testimony, other than that which I give you a hypothetical [sic]. Assume the past work activity, same as the claimant's exertional capacity limited to light work with the need to be able to alternate sitting and standing periodically throughout the day. Not necessarily a will [sic], but if circumstances would allow, so that by the end you can sit about half the time. And stand about half the time, if desired with no climbing of ladders, ropes, or scaffolds. Other postural

|     |     |
| --- | --- |
|     | functions could be performed occasionally.  You need to avoid environmental hazards, such as unprotected heights, and dangerous machinery, and also the need to avoid concentrated exposure to pulmonary irritants.  The limitations could be performed as a simple and repetitive tasks [sic] that would involve little or no change in work routine.  No interaction with the general public, and occasional interaction with coworkers, and supervisors.  First of all, of course, all that past work activity would be precluded, right? |
| A.  | Yes it would, your honor. |
| Q.  | Oh, if we now add the vocational factors by assuming that the hypothetical individual is move - - is of the claimant's age, education, and work history.  Would there be any unskilled jobs in the state of Illinois that such a person could perform? |
| A.  | Yes, sir, there would be some unskilled work in the state of Illinois.  And I can testify to those.  And also tell you that I don't think these jobs would be unique to the Illinois economy.  They would exist in other regions of the nation. |

\* \* \*

|     |     |
| --- | --- |
| A.  | Unfortunate [sic] to population.  But one example at the light exertional level is a mail sorter. |

\* \* \*

|     |     |
| --- | --- |
| A.  | Also alternate - - alternatively noted as a male [sic] clerk.  That's 209.987-026.  In Illinois now there are about 3,700 of those jobs being done.  It would be an estimate for me to say there would need to be a reduction in those numbers, though, when you factor in that sit/stand option. |

\* \* \*

|     |     |
| --- | --- |
| A.  | Maybe two thirds of those jobs would be eliminated. |

\* \* \*

|     |     |
| --- | --- |
| A.  | A second example would be an office helper, which is 239.567-010.  And there are about 4,700 of those jobs being done now in Illinois.  And again you would need to reduce those numbers, similarly as before because of the sit/stand option. |

\* \* \*

|     |     |
| --- | --- |
| Q.  | What about if I reduce the exertional capacity to sedentary, and kept everything else the way it was?  What - - would there be jobs at that point? |
| A.  | Yes, sir, there would be jobs, unskilled jobs at the sedentary level.  It could be learned within 30 days of on-the-job |

|   |   |
|---|---|
|   | training, or orientation, such as, for example, a type of general office clerk work as a document preparer, microfilming. That's the DOT title, 249.587-018.  There are about 2,800 of those jobs in Illinois.  Another example would be final assembler, 713.687-018 is the code, which is about 1,700 of those jobs in Illinois.  And I'm of the opinion based on my experience and my training that I don't think there'd be any real significant or any reduction in those numbers with the need for a - - to alternate from sitting to standing - - |

<div style="text-align:center">* * *</div>

A.   - - as you described.
Q.   What - - this particular assembling job, what is it that the person assembles, what's - -
A.   Optical goods.

<div style="text-align:center">* * *</div>

Q.   All right.  With regards to these jobs that we've discussed, how many absences per month would an employer typically tolerate from an employee. [sic]  And have them keep their job?
A.   And my answer is prefaced on experience and training since the DOT is silent on that type of issue.  My opinion would be no than [sic] one absence, perhaps, per month would be tolerated.
Q.   Okay.  And is your testimony consistent with the Dictionary of Occupational Titles?
A.   Other than my answer to that last question, and also the answers based on the sit/stand option.
Q.   Okay.  And if someone in from [sic] this area wanted to be able to, you know, find these kind - - assuming there'd be - - might be vacancies, assume - - find these kinds of jobs - -

<div style="text-align:center">* * *</div>

Q.   - - so it would be more particular in a job search.  Was there any sort of resources they could utilize to be able to do that?
A.   Yes, sir, the Illinois Department of Employment Security would be one resource - -

<div style="text-align:center">* * *</div>

A.   - - which anyone is a resident of the state and can qualify for those services.  And also the Division of Rehabilitation Services, which is part of the Department of Human Services in the state of Illinois.

<div style="text-align:center">5</div>

> \* \* \*
> A.  So and they explicitly deal with persons who have physical and or mental issues, which affect their ability to work. And helping those people get back to work, or get to work.

AR 68-72.

### III

In his Decision, the ALJ detailed Davis's medically determinable impairments at the time of her most recent favorable medical decision finding her disabled (September 30, 2003), her disability end date of June 1, 2011, and the medical evidence which established that as of June 1, 2011, Davis's medically determinable impairments were history of kidney and pancreas transplants, hypertension, history of adrenal insufficiency, depression, and anxiety with periodic migraines manifesting later.  When discussing whether Davis's impairments or combination of impairments met or medically equaled the severity of a listed impairment, the ALJ noted that Davis established "at most moderate difficulties in maintaining concentration, persistence, or pace." AR 21.

> The ALJ crafted the following Residual Functional Capacity (RFC):
>
> Based on the impairments present as of June 1, 2011, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the work must allow for alternating between sitting and standing periodically for equal amounts of time if desired, occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, no climbing of ladders, ropes, or scaffolds, no concentrated exposure to pulmonary irritants, and no work at unprotected heights or around unprotected hazardous machinery. The work must be simple and repetitive in nature with little or no change in work routine and no more than occasional interaction with coworkers or supervisors and no work with the public.

AR 23. In making that finding, the ALJ discussed Davis's testimony and her friend Angie Qualls's testimony before the disability hearing officer on

6

November 19, 2012 and the disability hearing officer's own notes from that date. The ALJ also detailed Davis's testimony before him at the December 2013 hearing. He included a list of Davis's reported daily activities and how she accomplished them. The ALJ considered the medical records pertaining to Davis's follow up appointments about her transplants and her mental health records. The ALJ recited the results of state agency evaluations done on May 24, 2011 and May 26, 2011 as well as state agency medical and psychological consultation results dated June 6, 2011, June 8, 2011, July 26, 2011, and July 27, 2011.

Particularly with regard to the ALJ's discussion of the state agency psychological consultant's assessments, the ALJ included that the consultants indicated that Davis had moderate difficulties in maintaining concentration, persistence, or pace and one indicated moderate difficulties in maintaining social functioning. The ALJ also detailed that the VE testified that an individual with Davis's age, education, work experience, and RFC, would be able to perform the requirements of representative occupations such as general office clerk (document preparation clerk) or final assembler. For the former job the ALJ indicated 2,800 sedentary jobs in Illinois and for the latter job the ALJ indicated 1,700 jobs in Illinois. The ALJ explained that the VE's testimony was consistent with the information contained in the DOT except that his opinion on the sit/stand option was based on experience. Lastly, the ALJ stated:

> Based on the testimony of the vocational expert, the undersigned concludes that as of June 1, 2011, the claimant is capable of making a successful adjustment to work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

AR 32.

## IV

Davis alleges the following five errors: 1) the ALJ erred by not properly developing the record; 2) the Commissioner cannot sustain her Step 5 burden of proving a significant number of jobs[2]; 3) the ALJ failed to properly assess credibility; 4) the ALJ's functional capacity finding lacked a supported record basis; and 5) the ALJ failed to properly accommodate limitations in concentration, persistence, or pace.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). Furthermore, determinations of credibility made by the ALJ will not be overturned unless the findings are clearly erroneous. *Anderson v. Bessemer City*,

---

[2] Though Davis identifies the Commissioner's error at "step 5," her case involves a decision that Davis's disability *ended* rather than an *initial* decision that she was not disabled. Therefore, the eight-step process for her Title II claim for determining whether a claimant who was found disabled *continues* to be disabled applies rather than the five-step test used to make the factual determination of whether disability is established. *See infra* pgs. 9-11.

8

470 U.S. 564, 573 (1985); *Imani v. Heckler*, 797 F.2d 508 (7th Cir. 1986), *cert. denied*, 479 U.S. 988 580 (1986).

First, the claimant must be suffering from a medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, a person is disabled only if his physical or mental impairment or impairments are of such severity that he is both unable to do his previous work and also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant who was found disabled continues to be disabled, the ALJ follows an eight-step process for a Title II claim. 20 C.F.R. § 404.1594.

In the first step, the ALJ must determine if the claimant is engaging in substantial gainful activity (SGA); if so, the claimant is no longer disabled. 20 C.F.R. § 404.1594(f)(1). If the claimant is not engaged in SGA, step two requires the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant does, his disability continues. 20 C.F.R. § 404.1594(f)(2).

At step three, the ALJ must determine whether medical improvement has occurred. 20 C.F.R. § 404.1594(f)(3). Medical improvement is any decrease in the medical severity of the claimant's impairment(s) that were present at the time of the most recent favorable medical decision, and medical improvement is established by improvement in symptoms, signs, and/or laboratory findings. 20 C.F.R. § 404.1594(b)(1). If medical improvement has occurred, the analysis proceeds to the fourth step. If not, the analysis proceeds to the fifth step.

At step four, the ALJ must determine whether the medical improvement is related to the ability to work. 20 C.F.R. § 404.1594(f)(4).[3] If so, the analysis proceeds to step six.

At step five, the ALJ must determine if an exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5). There are two groups of exceptions. 20 C.F.R. §§ 404.1594(d), (e). If an exception from the first group applies, the analysis proceeds to the next step. If an exception from the second group applies, the claimant's disability ends. If no exception applies the claimant's disability continues.

Step six requires the ALJ to determine whether all the claimant's current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step.

At step seven, the ALJ must assess the claimant's residual functional capacity (RFC) based on the current impairments and determine if she can perform past relevant work. 20 C.F.R. § 404.1594(f)(7). If the claimant has the capacity to perform past relevant work, her disability has ended. If not, the analysis proceeds to the last step.

At the last step, the ALJ must determine whether other work exists that the claimant can perform, given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 404.1594(f)(8). If the claimant can perform other work, she no longer is disabled. If the claimant cannot perform other work, her disability continues. At this last step, the claimant still has the burden of proving disability, but a limited burden of going forward with the evidence

---

[3] Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. 20 C.F.R. § 404.1594(b)(3).

10

shifts to the Social Security Administration. To support a finding of non-disability, the SSA must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experience.

In the instant case, Davis claims error at Steps 7 and 8.

### A

Davis argues that the ALJ did not obtain a valid waiver of counsel and so the Commissioner bears the burden to establish a fully developed record. She argues that the ALJ failed in his heightened duty to properly question the VE about the impact of Davis's moderate difficulties in maintaining concentration, persistence, or pace, failed to question the VE to determine how the identified jobs were compatible with her other mental limitations, failed to develop the basis for the VE's testimony in order to determine its reliability, and did not properly develop the record to resolve obvious inconsistencies between the Dictionary of Occupational Titles (DOT) and the VE's testimony. While the Commissioner concedes that the ALJ did not obtain a valid waiver of counsel from Davis in this case, the Commissioner argues that such a failure was harmless because the ALJ nevertheless adequately developed the record. The Commissioner also argues that the Court can conclude that the 1,700 final assembler of optical goods jobs testified to by the VE was a "significant number" in satisfaction of the SSA's burden at the last step. The Commissioner contends that the ALJ was permitted to rely on the VE's testimony where Davis has not identified any inconsistency between the VE's testimony and the DOT, and the DOT cannot conflict with the VE on an issue which it does not address.

An ALJ has a "basic obligation to develop a full and fair record," which is particularly so where the claimant is unrepresented by counsel so that the ALJ has a duty to "scrupulously and conscientiously probe into, inquire of, and

explore all relevant facts." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (internal citations omitted). However, how much evidence to gather is typically left to the reasoned judgment of the Commissioner, and a significant omission is usually required before the court will find that the Commissioner failed to assist a *pro se* claimant in developing the record fully and fairly. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). Where an ALJ does not obtain a valid waiver, the burden is on the [Commissioner] to show the ALJ adequately developed the record. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994).

Because the Commissioner concedes that the ALJ did not obtain a valid waiver of counsel from Davis, the Court must only determine whether the ALJ adequately developed the record. The ALJ did not do so as illustrated by the testimony he elicited from the VE which is discussed in detail below.

"Ordinarily, an ALJ's hypothetical questions to a VE must include all limitations supported by medical evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009) (internal citation omitted). In other words, an ALJ must orient the VE to the totality of the claimant's limitations, including those pertaining to deficiencies in concentration, persistence, or pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Here, the ALJ noted more than once in his Decision that Davis had moderate difficulties in maintaining concentration, persistence, or pace and he specifically cited to state agency doctors' forms wherein they indicated moderate difficulties in certain categories. The ALJ explained that he "generally agree[d] with the state agency mental assessments." AR 29. However, at the hearing, the ALJ did not include in his hypotheticals to the VE those particular areas in which Davis was determined to experience moderate difficulty.

In his hypotheticals to the VE, the ALJ went only so far as to ask the VE about an individual limited to "simple and repetitive tasks that would involve

little or no change in work routine" and "no interaction with the general public, and occasional interaction with coworkers, and supervisors." AR 68. Notably, before the ALJ posed the hypothetical to the VE, the ALJ asked that the VE disregard any information he may have gathered from reading the file or listening to the testimony other than that which he gave the VE in the hypothetical. Thus, not only did the ALJ fail to include Davis's moderate limitations in his hypotheticals, but also by instructing the VE in that way, the VE was prohibited from considering any moderate limitations Davis had that he may have absorbed through his own review of the evidence of record or by listening to Davis's hearing testimony. *See Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004) (explaining that the ALJ, by circumscribing the exact limitations the VE was to follow for each question, prohibited the VE from considering physical, psychological, or cognitive limitations that he may have absorbed either through reviewing the evidence in the record or by listening to the hearing testimony).

Davis also correctly faults the ALJ for failing to inquire into the basis for the VE's job numbers, especially where the VE provided testimony of his estimation of the reduction in the number of jobs due to the sit/stand option. The Seventh Circuit Court of Appeals has previously made clear that "[i]f the basis of the vocational expert's conclusions is questioned at the hearing then the ALJ should make an inquiry to find out whether the purported expert's conclusions is reliable." *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2003) (internal quotations omitted). More recently, the Seventh Circuit has emphasized its "profound doubt" about the source and accuracy of the statistics of available jobs in the local, state, and national economy to which the VEs testify in Social Security cases. *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014), citing *Browning v. Colvin*, 766 F.3d 702, 708-12 (7th Cir. 2014); *see also Alaura v.*

13

*Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) ("We have recently expressed concern with the source and validity of the statistics that vocational experts trot out in social security disability hearings").

The *Hermann* Court noted that the VE in that case cited the DOT as the only public source for the numbers and testified that he relied upon his own knowledge of the industry. *Herrmann*, 772 F.3d at 1113. The *Hermann* Court further noted, however, that the VE did not explain how impressions from unspecified past experience and knowledge could enable him to determine numbers of particular jobs, he did not reveal what surveys he had relied upon and what they had shown, and the VE referred to the DOT which was an obsolete catalog of jobs that contained no statistics regarding job numbers in a given category that existed in the local, state, or national economy. *Id.* at 1113-14.

Here, the VE's testimony was both equivocal and conclusory. He testified:

A. [T]here would be some unskilled work in the state of Illinois. And I can testify to those. And also tell you that I don't think these jobs would be unique to the Illinois economy. They would exist in other regions of the nation.
\* \* \*
A. In Illinois now there are about 3,700 of those jobs [mail clerk] being done. It would be an estimate for me to say that there would need to be a reduction in those numbers, though, when you factor in that sit/stand option.
\* \* \*
A. Maybe two thirds of those jobs would be eliminated.
\* \* \*
A. A second example would be an office helper . . . and there are about 4,700 of those jobs being done now in Illinois. And again you would need to reduce those numbers, similarly as before because of the sit/stand option.
\* \* \*
A. . . . And I'm of the opinion based on my experience and my training that I don't think there'd be any real significant or

> Q.  . . . And is your testimony consistent with the Dictionary of Occupational Titles?
> A.  Other than my answer to that last question [about the number of absences per month], and also the answers based on the sit/stand option.

>  any reduction in those numbers with the need for a - - to alternate from sitting to standing.


> any reduction in those numbers with the need for a - - to alternate from sitting to standing.
> Q.  . . . And is your testimony consistent with the Dictionary of Occupational Titles?
> A.  Other than my answer to that last question [about the number of absences per month], and also the answers based on the sit/stand option.

AR 69-71. Given that Davis was unrepresented and the VE's testimony was merely conclusory on the question of available jobs (and particularly the available jobs with a sit/stand option), and given the authority discussed above, the ALJ had an *obligation* to further question the VE about reliability of his testimony in order for the ALJ to satisfy his burden to adequately develop the record. For those reasons, such an obligation arose regardless of the fact that Davis did not question the basis of the VE's testimony at the hearing. Of course, given the ALJ's failure to probe into the VE's testimony, the Social Security Administration also did not satisfy its duty to demonstrate that other work existed in significant numbers in the national economy that Davis could do with her RFC, age, education, and work experience. Notably, the Commissioner takes the position that even if the identified job of microfilming is outdated, the VE testified that there were 1,700 jobs of final assembler of optical goods in the State of Illinois which the Court could conclude is a significant number. However, the Court can do no such thing here where the VE's testimony was not sufficiently tested by the ALJ as the ALJ was obliged to do under the particular circumstances.

The Commissioner's argument that it was reasonable for the ALJ to rely upon the VE's testimony where, for one reason, the VE identified agencies that would assist individuals with mental or physical limitations find the identified jobs is simply unpersuasive. The Commissioner does not cite to any authority

which provides that as long as a VE testifies as to where or how a claimant can find the jobs identified, the VE's testimony is sufficiently reliable. Nor does the Commissioner, by way of any substantive argument, convince the Court of such a proposition.

Additionally, the ALJ did not sufficiently develop the record with regard to the availability of a sit/stand option for the jobs identified by the VE. Davis argues that the ALJ did not properly resolve the conflict between the VE's testimony about a sit/stand option with the identified jobs and the DOT. Davis contends that it was erroneous for the ALJ to not question the VE about the adaptability of the work of an optical assembler or microfilm document preparer to either a seated or standing position. Davis further argues that if she were sitting and standing for equal amounts of time during the day that would be at odds with her restriction to sedentary work because such work generally involves standing or walking no more than two hours in a workday. The Commissioner disputes there was any conflict between the VE's testimony and the DOT where the DOT does not address sit/stand options and therefore it could not conflict with the VE on an issue which it does not address. The Commissioner also argues that Davis has not explained why the height of the workstation was relevant to her ability to work.

While the Commissioner is technically correct that the VE's testimony could not have conflicted with the DOT where the DOT is silent on sit/stand options, that argument is too literal. So too is the Commissioner's contention that Davis has not explained why the height of the workstation was relevant to her ability to work. First, the Commissioner's position in this regard is too literal where, as addressed above, the ALJ had the obligation to further develop the VE's testimony regarding both his reliability and the basis for the job numbers he cited in the face of such conclusory testimony and the fact that Davis was

16

unrepresented. Second, as Davis points out in her Reply, the Commissioner's response about the height of the workstation is misdirected. Because the VE's testimony was so lacking in detail, the necessary question of whether the number of identified jobs *could be acceptably performed* from both a sitting and standing position (by whomever, not Davis specifically) was left unanswered. Finally, Davis correctly points out that sitting and standing for equal amounts of time during the day is, on its face, at odds with the definition of sedentary work which is defined as standing and walking no more than two hours in an eight hour work day. *See Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) (citing the definition for sedentary work at 20 C.F.R. § 404.1567(a) as work a claimant can do if she can, among other things, occasionally walk or stand for not more than about two hours of an eight-hour workday). Thus, the fact that the ALJ took at face value, without any further probing, the VE's testimony that the sit/stand option would not have any "real significant" or "any reduction" in the job numbers again emphasizes the ALJ's failure in adequately developing the record.

The errors the ALJ committed in failing to develop the record as it pertains to the VE's testimony amounted to significant omissions which necessitate remand.

### B

It is unnecessary for the Court to address the remainder of Davis's arguments, as the Court has already determined that remand is necessary. Nonetheless, in light of the fact that the Court is remanding this matter for the aforementioned reasons, the ALJ shall revisit his credibility assessment, functional capacity finding, and accommodation of Davis's limitations in concentration, persistence, or pace to the extent necessary to ensure that the testimony he elicits from the VE is sufficient.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 19) is GRANTED, the Defendant's Motion for Summary Affirmance (Doc. 24) is DENIED, and this matter is REMANDED pursuant to Sentence Four of 42 U.S.C. § 405(g) for the ALJ to adequately develop the record by properly fulfilling his obligations to confirm that the VE's testimony is reliable and to resolve any conflicts that the VE's testimony presents.

*It is so ordered.*

Entered on May 17, 2016.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE